UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
JANICE FOSS,

                    Plaintiff,          MEMORANDUM AND ORDER
                                        07-CV-1322 (JS)(WDW)
          -against-

COCA COLA ENTERPRISES, INC., ET AL.,

                    Defendants.
--------------------------------X
APPEARANCES
For Plaintiff:      Frederick K. Brewington, Esq.
                    Mili Makhijani, Esq.
                    Law Offices of Frederick K. Brewington
                    556 Peninsula Boulevard
                    Hempstead, NY 11550

For Defendants:     Bradford G. Harvey, Esq.
                    Ian K. Leavy, Esq.
                    Miller & Martin, LLP
                    1000 Volunteer Building
                    832 Georgia Avenue
                    Chattanooga, TN 37402-2289

                    Philip M. Halpern, Esq.
                    Collier, Halpern, Newberg, Nolletti & Bock
                    One North Lexington Avenue, 15th Floor
                    White Plains, NY 10601

SEYBERT, District Judge:

          In May 2005, Defendant Coca-Cola Enterprises, Inc.
("Coca-Cola") fired Plaintiff Janice Foss, a 44 year old
African-American.    Ms. Foss then commenced this employment
discrimination suit.    In the operative Third Amended Complaint,
Ms. Foss asserts disparate treatment discrimination based on
race, color, and age.    She asserts claims under Title VII,
Section 1981, and the New York State Human Rights Law.

Pending before the Court is Defendants' summary judgment motion. In response, Ms. Foss has voluntarily discontinued her age discrimination claims, but otherwise opposes summary judgment. (Pl. Opp. Br. at 1.) For the following reasons, Defendants' motion is GRANTED.

BACKGROUND

In March 1998, Coca-Cola hired Ms. Foss as a Cold Drink Channel Sales Manager, based out of its Hawthorne, New York office. (Def. 56.1 Stmt. ¶ 1.) In April 2002, Coca-Cola promoted her to Area Cold Drink Sales Manager. (Id. at ¶ 2.)

Ms. Foss received mostly positive performance reviews. From 1998 to 2004, she always received a merit raise and "above target" or "on target" performance ratings. (Pl. 56.1 Counter-Stmt. ¶ 11.) In her 2004 review, for instance, she received 23 "meets expectations" ratings, one "above expectations" rating, and six "exceeds expectations" ratings. (Id. at ¶ 12.) Additionally, Ms. Foss steadily obtained "Consistent/yellow" or "Developmental/blue" ratings in Coca Cola's Talent Development Categories color scheme, reflecting Coca Cola's belief that she was either well-suited in her current position, or an employee with a high potential for advancement. (Id. ¶¶ 21-24.) She never received an "Opportunity/red" coding which, under Coca

Cola's Orwellian appraisal system, signifies sub-par performance.[1]  (Id. ¶ 26.)

However, Ms. Foss' otherwise positive performance reviews contained the consistent caveat that she needed to improve her interpersonal skills.  In March 2000, her annual performance review stated that "[s]he will be a stronger leader in the future, as she improves in the area of conflict resolution."  (Def. 56.1 Stmt. at ¶ 13.)  In November 2000, she received a Performance Development Plan ("PDP") that indicated a need for her to "Be more tactful & sensitive when expressing disagreement."  (Id. ¶ 16.)  In March 2001, her annual performance review set forth that she "demonstrated more flexibility in understanding the opinion of others," but then added that "Janice needs to continue to develop in this area in order to ensure success at the next level."  (Id. ¶ 18.)  In April 2003, her annual performance review indicated that she "must focus on her communication style when engaged with others whose position is different from hers," and needed to "[b]e more conscious of communicating with others opposed to her position at all levels."  (Id. ¶ 21.)

On September 8, 2003, while Ms. Foss was the Area Cold Drink Sales Manager, her superior, Brendan Walshe, sent an e-

---

[1] As Mr. Tallman explained in deposition, "the term opportunity would – I would mean that there was room for improvement." (Tallman Tr. 40.)

mail to her and two co-workers at a similar managerial level. (Pl. Ex. H; Def. 56.1 Stmt. ¶¶ 22-24.) The e-mail did not single out Ms. Foss.[2] (Pl. Ex. H.) But, among other things, it: (i) severely criticized the "genuine lack of respect among the team members"; (ii) noted that "Senior managers in this company are expected to be aggressive in attacking behavior that contributes negatively to the team," and are "not expected to contribute to that behavior"; and (iii) stressed that "Respecting one's individualism and right to opinion are essential elements we must improve upon." (Id.) The e-mail further stated that "[a]ny behavior or comments from anyone on our team that negatively contributes to our environment and culture will be dealt with the appropriate discipline up to and including termination." (Id.)

Ms. Foss continued to receive similar performance reviews following this e-mail. On April 1, 2004, for instance, her annual performance review reflected Mr. Walshe's concern

---

[2] In opposing Defendants' motion, Ms. Foss claims that one of Coca Cola's witnesses, Michael Van Aken, "admit[ted] that Plaintiff Foss is not the subject of this email and it does not relate to anything Plaintiff Foss had or had not done." (Pl. Opp. Br. at 7.) But Mr. Van Aken admitted nothing of the kind. Instead, he simply agreed with Ms. Foss' counsel that the email's plain text did not single out Ms. Foss. (Van Aken Tr. at 159.) Mr. Van Aken then added that, although he heard "Nothing to suggest that [Ms. Foss] was disciplined or related specifically to a specific event," Ms. Foss had behavioral "opportunities" that "were identified in the performance appraisal." (Id. at 159-160.)

that she "be more conscious of her delivery as at times her style can dilute an otherwise valid or poignant comment." (Def. 56.1 Stmt. ¶ 25.)

During October 2004 through December 2004, Defendant Gene Tallman gradually assumed the role of Ms. Foss' direct manager. (Id. at ¶ 9; Pl. 56.1 Resp. ¶ 9.) Because Mr. Tallman replaced Mr. Walshe so late in the year, Mr. Walshe gave Ms. Foss her next annual performance review, in February 2005. (Def. 56.1 Stmt. ¶ 29.) In this review, Mr. Walshe asked Ms. Foss to publicly share peer feedback received during a "360 Degree Review." In addition, although Mr. Walshe praised Ms. Foss' "very professional and personable style when dealing with external customers and community leaders," he commented that Ms. Foss should "mirror that style internally on a more consistent basis," and set "New Goals" for her to "[u]se [a] professional and courteous communication style with colleagues and customers," and "Provide opinions, ideas, and solutions to issues in a constructive manner." (Pl. Ex. I at DEF-005.) That being said, Mr. Walshe awarded Ms. Foss a "Meets" expectations rating on her interpersonal skills. (Id.)

On the whole, Ms. Foss had a "fine" relationship with Mr. Walshe, and, at deposition, could not "recall" Mr. Walshe discriminating against her in any way. (Foss Tr. 133-134.)

Ms. Foss' relationship with Mr. Tallman was more difficult. The two first quarreled over lost accounts with Famous Familiar Pizza ("Famous"). In February 2005, Mr. Tallman met with his reports to discuss losing Famous' business. According to Mr. Tallman, Ms. Foss was not even aware that she had any Famous accounts, even though she had just lost two. (Def. Ex. D at Ex. A.) Mr. Tallman blamed Ms. Foss' ignorance on her decision to use her own Territory Plan, contending that, if she "properly utilize[ed] Territory Planning," she would have known about the two accounts, which collectively purchased 8000 cases. (Id.) And Ms. Foss does not dispute Mr. Tallman's story. At deposition, Ms. Foss testified that she could not recall whether she knew about the Famous accounts before Coca Cola lost them, conceded that she should have known about them, and couldn't "say" whether a standard territory plan would have helped her know about them. (Foss Tr. 146-48.)

Mr. Tallman and Ms. Foss also disagreed about pursuing 99 cent store business. Mr. Tallman wanted the Cold Drink division to seek 99 cent store sales. (Def. 56.1 Stmt. ¶¶ 46, 49.) Ms. Foss responded that, according to Cola Cola Vice President John Brennan, another Cola Coca division already catered to this market. (Pl. 56.1 Resp. ¶¶ 46, 47.) Ultimately, Ms. Foss did not recall pursuing 99 cent store business. (Def. 56.1 Stmt. ¶ 50.)

Mr. Tallman and Ms. Foss sparred over other business objectives as well. During a February 17, 2005 staff meeting, Mr. Tallman discussed implementing a standard Internal Rate of Return goal for the North American Business Unit. (Def. 56.1 Stmt. ¶ 56.) Ms. Foss replied that Mr. Brennan had set a different goal for her area. (Id. ¶ 57.) Ultimately, Ms. Foss declined Mr. Tallman's suggestion to use a common goal with the division, instead of a separate goal for her area. (Foss Tr. 164.)

Mr. Tallman and Ms. Foss also differed about whether Business Development Representatives should have targets for actual placements, or just sales calls. (Foss Tr. 189-92.) Mr. Tallman left Ms. Foss a voice mail requesting actual placement targets. (Def. 56.1 Stmt. ¶ 67). But, despite this voicemail, Ms. Foss then sent Mr. Tallman an attachment that contained sales call targets, but not actual placement targets. (Foss Tr. 193.) When, however, Mr. Tallman reiterated that he wanted placement targets, Ms. Foss complied and sent them to him. (Foss Tr. 193).

Additionally, during an April 2005 staff meeting, Mr. Tallman and Ms. Foss feuded about Cold Drink's Trimester Priorities. At this meeting, Mr. Tallman rejected an opinion expressed by one of Ms. Foss' co-workers. (Def. 56.1 Stmt. ¶ 71.) Ms. Foss then supported the opinion that Mr. Tallman had

just rejected. (Id. ¶ 73.) And, when Mr. Tallman rejected that opinion again, Ms. Foss continued to press her case. (Id. ¶ 75; Foss Tr. 109-12.) Ms. Foss indicated, however, that she would execute whatever he decided. (Foss Tr. 112.)

Still another clash occurred over various analyses that Mr. Tallman asked Ms. Foss to perform. On January 25, 2005, Ms. Foss turned in a First Line Operator report that contained incorrect pricing information. (Def. 56.1 Stmt. ¶ 53.) Then, after Mr. Tallman requested a Trimester One priorities report, Ms. Foss turned in incomplete work with missing information. (Id. ¶ 55.)

Ms. Foss did not just have conflicts with Mr. Tallman. She also had difficulties with several co-workers. Tammy Beredetsky, an administrative assistant, complained about Ms. Foss "a couple of times" to Mr. Tallman, claiming that Ms. Foss "at times was belligerent." (Def. Ex. F.) Similarly, in April 2005, Leonard Erlanger, an Area Cold Drink Manager, submitted a written complaint[3] to Mr. Tallman about Ms. Foss' "negative and improper actions," documenting how "Ms. Foss had made [him] uncomfortable" and opining that "her behavior was destructive to the team." (Def. Ex. J.)

---

[3] Defendants did not produce this document, either in discovery, or as a summary judgment exhibit. (Pl. 56.1 Stmt. ¶ 88.)

Additionally, on April 28, 2005, Janice McCarthy, a Cold Drink District Sales Manager, filed a written complaint against Ms. Foss with Mr. Tallman. (Def. Ex. G.) Ms. McCarthy claimed that she "experienced Janice's unprofessional and condescending actions which made it uncomfortable" to work with her. (Id.) More specifically, Ms. McCarthy claimed that, at an April 8, 2005 meeting, Ms. Foss "rudely interrupted [her] and unprofessionally accused [her] of causing various problems." (Def. Ex. G.)

Two co-workers corroborate Ms. McCarthy's account of the April 8, 2005 meeting. Jim Yasko, an Area Cold Drink Manager, believes Ms. Foss' conduct "could have been viewed as unprofessional," and spoke with Mr. Tallman about what transpired. (Def. Ex. H.) And Joe Barlie, a Cold Drink District Sales Manager, recounts that Ms. Foss "aggressively questioned and interrupted Ms. McCarthy" and, "In an unprofessional manner . . . blamed any problems in the department on [her]." (Def. Ex. I.) According to Mr. Barlie, "Ms. Foss' actions during the meeting made everyone in the room very uncomfortable." (Def. Ex. I.) Like Mr. Yasko, Mr. Barlie also spoke with Mr. Tallman about Ms. Foss' conduct. (Id.)

Ms. Foss did have her supporters, however. One of her co-workers, Jeff Long, largely blamed Mr. Tallman for his conflicts with Ms. Foss. (Pl. Ex. SS.) Among other things, Mr.

Long suggests that Mr. Tallman had his own interpersonal "opportunities" to work through. (Id.) Mr. Long further expressed his belief that some team members had "positive working experiences" with Ms. Foss.[4] (Id.) Mr. Long did not, however, attribute Mr. Tallman's problems with Ms. Foss to any improper discriminatory motive.

In fact, Ms. Foss has not adduced any direct evidence of discriminatory intent. At deposition, Ms. Foss could not recall whether she heard any racial comments during her employment, and couldn't "think of anything" she might have heard. (Foss Tr. at 263-64.) Likewise, Ms. Foss never complained of discrimination, or unfair treatment based on race. (Foss Tr. at 140.) At most, Ms. Foss complained only about "unfair treatment" unconnected to race, such as how Coca Cola failed to properly describe its Management Acceleration Program's criteria. (Id. at 140-41.) Finally, there is no evidence that Mr. Tallman generally disfavored minorities. On the contrary, he promoted five African-American and five Hispanic employees, with nine of these promotions occurring before he fired Ms. Foss. (Tallman Aff. ¶ 2.)

---

[4] Although the Court recounts Mr. Long's statements, it cannot credit his personal opinion about what other people thought of Ms. Foss. Tullo v. City of Mount Vernon, 237 F. Supp. 2d 493, 503 (S.D.N.Y. 2002) ("speculation" about "what others were thinking" is inadmissible and "does not constitute evidence of discriminatory intent").

Instead, Ms. Foss attempts to show that Defendants discriminated against her by treating similarly situated individuals differently, and by not adhering to its progressive disciplinary policies. In addition, Ms. Foss speculates that Mr. Tallman mistreated other minority employees.

DISCUSSION

## I. Summary Judgment Standard

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp. (In re Blackwood Assocs., L.P.), 153 F.3d 61, 67 (2d Cir. 1998) (citing Fed. R. Civ. P. 56(c)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor

of the party against whom summary judgment is sought." <u>McLee</u>, 109 F.3d at 134.

"Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000) (quoting <u>Anderson</u>, 477 U.S. at 256). "Mere conclusory allegations or denials will not suffice." <u>William v. Smith</u>, 781 F.2d 319, 323 (2d Cir. 1986).

Discrimination claims brought under Title VII, Section 1981, and the NYSHRL are analyzed under the burden-shifting framework the Supreme Court established in <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), applies. <u>See</u> <u>Ruiz v. County of Rockland</u>, 609 F.3d 486, 491 (2d Cir. 2010); <u>Ferraro v. Kellwood Co.</u>, 440 F.3d 96, 99-100 (2d Cir. 2006). That framework requires a plaintiff to first establish a <u>prima facie</u> case of discrimination, after which the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. <u>Ferraro</u>, 440 F.3d at 100. Once the defendant provides such a reason, the plaintiff must show "sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a

pretext" for discrimination. _Id._ (internal citations and quotations omitted).

To establish a _prima facie_ case of discrimination, a plaintiff must show that: 1) she belonged to a protected class; 2) she was qualified for the position; 3) she suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." _Terry v. Ashcroft_, 336 F.3d 128, 138 (2d Cir. 2003).

## II. Prima Facie Case

Here, there is no dispute that Ms. Foss has established the first three prongs of her _prima facie_ case. She is African-American, was qualified to work as an Area Cold Drink Sales Manager, and suffered an adverse employment action when Coca Cola terminated her. Defendants, however, contend that Ms. Foss cannot show that her termination "occurred under circumstances giving rise to an inference of discriminatory intent." _Terry_, 336 F.3d at 138. In response, Ms. Foss argues that she meets this prong because Coca Cola: (A) treated three similarly situated non-African-Americans better than her; and (B) failed to follow its own progressive discipline policy. The Court considers each of these arguments, in turn.

A.  Similarly Situated

"A showing of disparate treatment--that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group--is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." Ruiz, 609 F.3d at 493 (2d Cir. 2010). "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." Id. "In other words, the comparator must be similarly situated to the plaintiff in all material respects. Id.

"All material respects" does not, however, mean "all respects." McGuinness v. Lincoln Hall, 263 F.3d 49, 53-54 (2d Cir. 2001). Thus, the alleged comparator needn't "ha[ve] the same supervisor, work[] under the same standards, and engage[] in the same conduct." Id. at 53. Instead, the applicable standard requires only "a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." Id. at 54. In this regard, a plaintiff "must show" that: (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards, and (2) whether the conduct for which the employer imposed discipline

was of comparable seriousness. <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 40 (2d Cir. 2000). "The standard for comparing conduct," in turn, "requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." <u>Id.</u>

Here, Ms. Foss identifies two potential comparators: Leonard Erlanger and Jim Hannon. The Court considers both of these potential comparators, in turn.

### 1. Mr. Erlanger

Mr. Erlanger was a white manager on Ms. Foss' level, who Mr. Tallman also supervised. During an April 4, 2005 meeting, Mr. Erlanger's co-workers raised several complaints about his performance to Mr. Tallman. (Pl. Ex. II.) One co-worker commented that "Lenny has done nothing to establish trust with me," "has no credibility with this team," and "seems to have no experience." (<u>Id.</u>) Another co-worker complained that Mr. Erlanger "does not know how to use Margin Minder," resulting in him producing the wrong figures. (<u>Id.</u>) And still another co-worker complained that Mr. Erlanger "seems to have a need to know everything we are doing all the time." (<u>Id.</u>) At the same meeting, Ms. Foss was described as a "solid resource," a "good overall resource," and "knowledgeable." (<u>Id.</u>) However, Ms. Foss' co-workers did indicate that she had "people s[k]ill issues" and was "challenging to deal with." (<u>Id.</u>)

The April meeting was not the first time that concerns about Mr. Erlanger's job performance had been raised. Mr. Erlanger's April 1999 performance review listed him as "Below Target" in three areas, and he received an "Action Plan" in 1997 that suggested various ways he could develop as an employee. (Pl. Ex. KK at DEF-715, 1305, 1308, 1310.)[5] And Ms. Foss, at times, had to assist Mr. Erlanger with his duties. For instance, in February 2005, Mr. Tallman asked Ms. Foss to "take time off of [her] duties to do a six week project" to help Mr. Erlanger. (Foss Tr. 139.)

Defendants do not seriously dispute that Mr. Erlanger meets the first prong of the "similarly situated" test--that Mr. Erlanger and Ms. Foss "were subject to the same workplace standards." Graham, 230 F.3d at 40. But they argue that Mr. Erlanger's and Ms. Foss' deficiencies were not of "comparable seriousness."

The Court agrees. In this regard, the Court notes that the inquiry is not whether a reasonable fact finder could consider Mr. Erlanger's assorted shortcomings "equally serious"

---

[5] Ms. Foss characterizes the 1997 Action plan as a disciplinary "Performance Improvement Plan" ("PIP"). (Pl. 56.1 Counter-Stmt. ¶ 55.) The Court does not credit this characterization. Nothing in the document describes it as a PIP. Moreover, Mr. Erlanger's 1997 performance review reflects that, overall, he "exceed[ed]" expectations. (Pl. Ex. KK at DEF-714.) That being said, as Mr. Tallman testified in deposition, an Action Plan differs from a PIP "mostly in name." (Tallman Tr. at 77.)

or "more serious" to Ms. Foss'. Instead, the "comparable seriousness" inquiry requires "comparable conduct" which, in turn, "requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." 230 F.3d at 40. This does not mean identical conduct. But it does mean, at a minimum, that the two employees' conduct must fall within the same general paradigm. In Graham, for instance, the plaintiff and his comparator "violated the express terms of the waiver they each signed." Id. at 42-43. How the employer reacted to the violated waiver thus became the basis for comparison, although the two employees' violations differed. Id. More recently, in a summary order, the Second Circuit found that a plaintiff who committed one kind of record keeping transgression was similarly situated to employees who committed other types of record keeping errors. See Berube v. Great Atlantic & Pacific Tea Co., Inc., 348 Fed. Appx. 684, 687 (2d Cir. 2009). But there, all the alleged conduct fell under the record keeping umbrella, making the "relative severity of conduct" a question for the jury. Id.

Here, conversely, Mr. Erlanger's and Ms. Foss' had wholly dissimilar performance issues, and thus lacked the requisite "reasonably close resemblance of the facts and circumstances." Graham, 230 F.3d at 40. Mr. Erlanger's co-workers did not describe his behavior as anything akin to

"belligerent," "destructive," "unprofessional," "condescending,"
or "rude[]." <u>See</u> <u>supra</u> 8-9. Instead, they criticized his
knowledge and competency. Thus, rather than bearing a
"reasonably close resemblance" to each other, Ms. Foss' and Mr.
Erlanger's faults instead resemble the proverbial differences
between "apples and oranges." <u>See</u> <u>generally</u> <u>Burke-Fowler v.</u>
<u>Orange County, Fla.</u>, 447 F.3d 1319, 1323 (11th Cir. 2006). And,
accordingly, Mr. Erlanger is not a proper comparator to her.
<u>Lee v. Connecticut</u>, 427 F. Supp. 2d 124, 132 (D. Conn. 2006)
(plaintiff who engaged in "threatening or harassing behavior"
not similarly situated to employees who "misuse[d] state
resources"); <u>Albury v. J.P. Morgan Chase</u>, 03-CV-2007, 2005 WL
746440, at *10 (S.D.N.Y. 2005) (plaintiff who improperly
"access[ed] confidential account information" not similarly
situated to employee who engaged in sexual harassment).

Secondarily, Ms. Foss argues that Jim Hannon serves as
a proper comparator. Like Ms. Foss, Mr. Hannon had documented
interpersonal issues. In June 2004, Coca Cola reacted to co-
worker complaints against him by placing him on a Performance
Improvement Plan. (Pl. Ex. FF at DEF-704 to DEF-705.) In
issuing the PIP, Coca Cola described Mr. Hannon's behavior as
"unprofessional," "discourteous," "unnecessarily argumentative,"
"condescending," and set forth that he "habitually oppress[ed]
employees." (<u>Id.</u>) Coca Cola's issues with Mr. Hannon were not

entirely identical to its issues with Ms. Foss. Among other things, Coca Cola suggested that Mr. Hannon may have employed "different standards for different work groups," and reported that "several associates" filed "EEOC charges." (Id. at DEF-704-05.) But, on the whole, Ms. Foss' and Mr. Hannon's failings both fall under the general rubric of interpersonal difficulties. Thus, comparing Ms. Foss to Mr. Hannon reflects not so much an "apples to oranges" comparison as it does contrasting a Granny Smith to a Golden Delicious.

Defendants argue that Mr. Hannon is not a proper comparator because he held a different position, in a different department, in a different state, and did not report to Mr. Tallman. (Def. Br. at 14.) In this regard, Defendants cite to Hargett v. Nat'l Westminster Bank, 78 F.3d 836, 839 (2d Cir. 1996). Defendants should, perhaps, have read this case more carefully. In Hargett, the Second Circuit held that a jury could properly consider the plaintiff's and comparator's different positions, in deciding whether they were "similarly situated." The Second Circuit "observe[d]," with apparent approval, that the district judge "did not hold that, as a matter of law, the individuals with whom Hargett compared himself were not 'similarly situated' to him." Id.

But, notwithstanding Defendants' curious reliance on Hargett, they correctly argue that Ms. Foss and Mr. Hannon are

not similarly situated. As Hargett suggested, similarly situated employees do not necessarily need to share the same job or position. Nor do they necessarily need to report to the same supervisor. See McGuinness v. Lincoln Hall, 263 F.3d 49, 53-54 (2d Cir. 2001) (it is a "misreading" of Second Circuit law to hold that "another employee cannot be similarly situated to a plaintiff unless the other employee had the same supervisor, worked under the same standards, and engaged in the same conduct"); Berube, 348 Fed. Appx. at 686 ("a different supervisor" is not "sufficient in itself" to disqualify a comparator as similarly situated).

But the elastic nature of the similarly situated inquiry can only stretch so far. Here, Ms. Foss worked in sales, as an Area Cold Drink Sales Manager, while Mr. Hannon managed a warehouse. Ms. Foss reported to Mr. Tallman, while Mr. Hannon reported to Kim Berger. And Mr. Tallman pushed for Ms. Foss' termination, while Mr.[6] Berger disciplined Mr. Hannon. This is too many differences to properly consider Ms. Foss and Mr. Hannon "similarly situated." See, e.g., Harrison v. U.S. Postal Service, 06-CV-13131, 2010 WL 3291804, at *7 (S.D.N.Y. 2010) (employees who reported to a "different plant manager, performed different tasks, and had different responsibilities" not similarly situated); Liburd v. Bronx Lebanon Hosp. Center,

---

[6] Kim Berger is a man. (Van Aken Tr. 250.)

20

07-CV-11316, 2009 WL 900739, at *5 n.8 (S.D.N.Y. 2009) (employees who worked in "different department and had different responsibilities" not similarly situated).

Finally, Ms. Foss argues that she is similarly situated to Mr. Berger, who also received a PIP. (Pl. Opp. Br. at 14.) She is not. Mr. Berger's deficiencies concerned his poor communication and time management skills, not "belligerent," "destructive," "unprofessional," "condescending," or "rude[]" behavior. (Pl. Ex. FF at 695-96; Van Aken Tr. 248-253); supra at 8-9. Additionally, though not dispositive, Mr. Berger did not report to Mr. Tallman, but to Jim Brennan. Conway v. Microsoft Corp., 414 F. Supp. 2d 450, 465 (S.D.N.Y. 2006) ("reporting to different supervisors continues to be important to the similarly situated analysis"). And Mr. Brennan, not Mr. Tallman, addressed Mr. Berger's conduct. See Syrkin v. State University of New York, 04-CV-4336, 2008 WL 4179690, at *7 (E.D.N.Y. 2008) ("when different decision-makers are involved, two decisions are rarely similarly situated") (internal citations and quotations omitted).

B.   Failure to Use Progressive Discipline

Ms. Foss also argues that Coca Cola's failure to terminate her without using its own progressive discipline policies creates an inference of discriminatory intent. This time, she is right.

21

"[D]epartures from procedural regularity" can create
an inference of discriminatory intent, sufficient to establish a
prima facie case.  Stern v. Trustees of Columbia University in
City of New York, 131 F.3d 305, 313 (2d Cir. 1997) (internal
citations and quotations omitted).  Thus, for example, if a
defendant's own progressive discipline policies recommend using
counseling before taking adverse action, the failure to follow
those policies "may be circumstantial evidence supporting an
inference of discrimination."  Eaton v. Coca-Cola Co., 06-CV-
1664, 2010 WL 2836737, at *11 (D. Conn. July 19, 2010).

Here, Ms. Foss evidences that Coca Cola used a
progressive discipline policy, which escalated from counseling,
to an oral warning, to a written warning and, eventually, to
termination.  (Pl. Exs. DD, SS.)  Indisputably, Coca Cola did
not follow that policy when it terminated Ms. Foss.  It follows
then that Ms. Foss has met her "de minimis burden" of showing an
inference of discriminatory intent and, thus, establishing her
prima facie case.  Windham v. Time Warner, Inc., 275 F.3d 179,
188 (2d Cir. 2001).

III. Legitimate Non-Discriminatory Reason

With Ms. Foss having established a prima facie case of
discrimination, the burden now shifts to Defendants to proffer a
legitimate non-discriminatory reason for terminating Ms. Foss.
They have done so.  Mr. Tallman informed Ms. Foss that he was

terminating her because of "complaints from co-workers about me concerning how I spoke to them verbally," which "correspond[] with how I interact with him." (Foss Tr. at 69-70.) And Defendants support that reason through several affidavits, submitted by Ms. Foss' co-workers, which describe her as "belligerent," "destructive," "unprofessional," "condescending," and/or "rude[]." Additionally, Defendants have documented, and Plaintiff does not dispute, that Ms. Foss frequently feuded with Mr. Tallman himself. See supra at 6-8.

Moreover, Defendants have also documented why they did not employ Coca Cola's progressive discipline policy. According to Defendants, they viewed "progressive discipline" as "a tool that we can use in certain instances depending on the circumstances." (Van Aken Tr. 31.) Thus, rather than being mandatory before termination, Coca Cola actually had "[n]o policy, rules around the use of it." (Id. at 32.) In general, however, Coca Cola did use progressive discipline "more with front line employees" than with "senior employees." (Id. at 31-32.) Similarly, Defendants evidence that they did not always issue PIPs, Action Plans, or "Red" performance appraisals before terminating salaried employees. Indeed, between 2003 and 2007, Coca Cola terminated 11 Caucasian salaried employees without first using these devices. (Def. 56.1 Stmt. ¶¶ 93, 95.)

It follows then that Defendants have more than met their burden of articulating a legitimate non-discriminatory reason for terminating Ms. Foss.

IV. Pretext

The burden now shifts to Ms. Foss to provide evidence supporting that Coca Cola's reasons for terminating her were pretextual. Principally, Ms. Foss attempts to do so by comparing herself to the supposedly similarly situated Messrs. Erlanger, Hannon, and Berger. But, as the Court finds that none of these people are truly similarly situated to Ms. Foss, see supra at 15-21, Coca Cola's better treatment of these persons is not evidence of pretext. So Ms. Foss must demonstrate pretext in some other way.

She tries. But none of her alternative methods succeeds. First, Ms. Foss argues that Mr. Long's affidavit demonstrates that Mr. Tallman "singled [her] out and treated [her] differently." (Pl. Opp. Br. at 16.) But this claim substantially overstates Mr. Long's testimony. In actuality, Mr. Long stated only that Mr. Tallman "singled out" Ms. Foss by "ma[king] an entry in his PDA" after Ms. Foss made a comment he disagreed with during a meeting. (Pl. Ex. SS.) In other words, Mr. Tallman took notes.

Second, Ms. Foss argues that Mr. Tallman had a pattern of treating African-Americans differently. In this regard, Ms.

Foss notes that, in 2007, Mr. Tallman criticized an African-American subordinate, Paul Ireland, in Mr. Ireland's performance review. (Pl. Br. at 17; Pl. Ex. HH.) Among other things, Mr. Tallman criticized Mr. Ireland for being a "task master," being "critical of direction or strategy before he learns everything about the direction," "talk[ing] down to people," and maintaining an "abrasive and arrogant approach." (Pl. Ex. HH.) But Ms. Foss has submitted nothing to suggest that Mr. Tallman's criticisms were not, in fact, 100% true. Nor did she attempt to do so. She neither deposed Mr. Ireland nor, when deposing, Mr. Tallman, even asked about him. Rather, Ms. Foss merely engages in the logical fallacy of <u>cum</u> <u>hoc</u> <u>ergo</u> <u>propter</u> <u>hoc</u> (correlation, therefore causation), speculating that, because Mr. Ireland is African-American, Mr. Tallman must have criticized him on racial grounds. <u>See</u> <u>Hines v. Hillside Children's Center</u>, 73 F. Supp. 2d 308, 324 (W.D.N.Y. 1999) ("post hoc ergo propter hoc fallacy" does not establish pretext). And "conjecture cannot establish pretext." <u>Kolenovic v. ABM Industries Inc.</u>, 361 Fed. Appx. 246, 249 (2d Cir. 2010).

More to the point, Ms. Foss' ignores Mr. Ireland's 2008 review, which strongly undercuts her accusations. In 2008, Mr. Tallman gave Mr. Ireland a stellar review. Among other things, he described Mr. Ireland as "a leader of leaders," "a true player in his area and beyond," who "[e]nsures timely and

effective two-way communication with all subordinates, peers and managers." (Pl. Ex. HH.)

Also fitting this supposed discriminatory pattern, Ms. Foss claims that Mr. Tallman was "in the practice of breaking down minority women," citing Mr. Tallman's statements to her and another woman, Rebecca Flores. (Pl. Br. at 18.) But, again, Ms. Foss' grossly overstates the record. In actuality, as Ms. Foss conceded at her deposition, Mr. Tallman told her that "sometimes you have to be broken down <u>before</u> <u>you</u> <u>can</u> <u>be built</u> <u>back</u> <u>up</u>," and that she "should speak" to Rebecca Flores <u>and</u> Tom Sagliano "about that." (Foss Tr. 42) (emphasis supplied.) And there is nothing overtly or implicitly racial in Mr. Tallman's comment, which reflects only a particular (abrasive) management style. Indeed, the parties agree that Tom Sagliano is not a "minority woman," but a white male. Moreover, Mr. Tallman subsequently promoted Ms. Flores. (Def. Ex. D at ¶ 2.)[7]  So, once again, Ms. Foss' allegations that Mr. Tallman

---

[7] Ms. Foss notes, correctly, that Defendants evidence Ms. Flores' promotion only through Mr. Tallman's affidavit, and provide no "employment documents to support Defendant Tallman's claims." (Pl. 56.1 Resp. ¶ 10.) It would have been preferable for Defendants to augment Mr. Tallman's representations with supporting documents. But Defendants' failure to do so does not impeach Mr. Tallman's testimony, which is both admissible and unrefuted. In this regard, the Court notes that Ms. Foss does not seek an adverse inference predicated on the lack of documentary evidence. So the Court can conclude only that Ms. Foss either did not request such documents in discovery, or received them and knows that they do not advance her claims.

sought to "brea[k] [her] down" because she was a minority amounts only to rank speculation. It does not suggest pretext. See Kolenovic, 361 Fed. Appx. at 249.

Consequently, Ms. Foss has failed to adduce evidence suggesting that Defendants' stated legitimate, non-discriminatory reasons for terminating her were pretextual. So it follow that Ms. Foss' discrimination claims cannot survive summary judgment.

## CONCLUSION

Defendants' summary judgment motion is GRANTED. The Clerk of the Court is directed to mark this matter as CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:    March __31__, 2011
          Central Islip, New York